UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JOSEPH ANTHONY MATIS, SR.<br>INDIVIDUALLY AND ON BEHALF<br>OF HIS DECEASED SON, MICHAEL<br>ANTHONY WAJDA | CIVIL ACTION |
| VERSUS | NO:  05-2615<br>C/W 06-0534 |
| SGT. AVERY PETER JOSEPH,<br>CAPTAIN KEITH COXIE, MAJOR<br>LEON WALKER, LASHON<br>NICHELLE JOHNSON, ST. JAMES<br>YOUTH CENTER, PARISH OF ST.<br>JAMES, AND ABC INSURANCE<br>COMPANY | SECTION: "S" (5) |

## ORDER AND REASONS

**IT IS HEREBY ORDERED** that the motions for summary judgment of Sergeant Avery

Peter Joseph, Captain Keith Coxie, Mayor Leon Walker, St. James Youth Center, and the Parish

of St. James are hereby **GRANTED**.

**IT IS FURTHER ORDERED** that the motion for summary judgment of Nurse Lashon

Johnson is **DENIED**.

## BACKGROUND

Plaintiffs, Joseph Anthony Matis, Sr. and Toni Lynn Zeller, filed this suit arising from

the suicide of their son, Michael Anthony Wajda, while he was in the custody of the St. James

Youth Center ("Center").  Wajda had been in half-way houses, detention centers, or with various

family members for all but six to eight weeks during the period from April 2003 through

December 15, 2004.  Wajda had attempted suicide three times prior to April 2004, and

threatened suicide on a number of occasions.  One of his attempted suicides occurred at this

Center in November 2003.

On the morning of December 15, 2004, Joseph Matis, Wajda's father, called the police to

report his son was fighting with him.  Wajda was taken into custody as ungovernable and was

admitted to the Center at approximately 12:15 p.m.  Wajda was found hanging in his room at

8:30 p.m. that evening and was pronounced dead at the scene.

Plaintiffs allege that the defendants, Nurse Lashon Nichelle Johnson, Captain Keith

Coxie, Sergeant Avery Peter Joseph, and Major Leon Walker, in their individual capacities, were

deliberately indifferent to Wajda's safety needs in failing to provide him with medication,

evaluation, counseling, supervision, and observation.  They allege that the Parish and Center

failed to establish and enforce adequate procedures to assure that detainees with a risk of suicide

were appropriately protected.

Specifically, the complaint alleges:

1.      The defendants were acting under the color of state law;

2.      That due to Wajda's prior  suicide attempt at the Center defendants knew or should have
        known that he was suicidal and that they knew that he was on medication for bi-polar
        disorder;

3.      The defendants noted just prior to his death that Wajda was in extreme distress;

4.      With a total indifference to Wajda's safety, Nurse Johnson failed to assure that Wajda
        received his medication, adequate counseling and observation in view of his mental
        history and diagnosis;

5.   In view of Wajda's mental history and diagnosis, Sergeant Joseph acted with a total indifference to Wajda's safety in failing to keep him under observation

6.   Captain Coxie and Major Walker had a duty to establish and enforce adequate intake procedures and procedures to make certain that detainees who are dangerous to themselves are kept under adequate and appropriate supervision and observation while at the Center;

7.   Captain Coxie, Major Walker, St. James Youth Center, and the Parish of St. James, failed to establish and enforce adequate procedures to insure that detainees with a risk of suicide were adequately medicated, evaluated, counseled, supervised, and observed; and

8.   As a direct and proximate cause of one or more of the alleged wrongful acts, the decedent died of asphyxiation by hanging.

Plaintiffs seek damages pursuant to 42 U.S.C. § 1983, and a state survival action pursuant to Article 2315.1 of the Louisiana Civil Code.

In this motion for summary judgment, all defendants assert they are entitled to dismissal. Nurse Lashon Nichelle Johnson, Captain Keith Coxie, Sergeant Avery Peter Joseph, and Major Leon Walker, as individual defendants, have asserted the defense of qualified immunity. The Parish and Center contend that their policies and procedures were not deficient.

## DISCUSSION

**A.    Summary Judgment Standard**.

Summary judgment is appropriate only if the record reveals that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The pleadings, depositions, admissions, and answers to interrogatories, together with any affidavits, must demonstrate that no genuine issue of material fact exists.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "Where the record, taken as a whole, could not lead to a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The facts are reviewed drawing all reasonable inferences in favor of the non-moving party. *Reid v. State Farm Mut. Auto Ins. Co.,* 784 F.2d 577, 578 (5th Cir. 1986). Summary judgment is mandated after adequate discovery and upon proper motion against a party who fails to make a sufficient showing to establish the existence of an essential element to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp.,* 477 U.S. at 322.

In determining whether an official enjoys qualified immunity in a § 1983 action, the Court must apply the objective reasonableness test announced in *Harlow v. Fitzgerald,* 457 U.S. 800 (1982), based on whether the official violated clearly established law. An official is entitled to qualified immunity so long as their actions do not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known. *Id.* at 818. Qualified immunity is available to all but the plainly incompetent or those who knowingly violate the law. *Malley v. Briggs,* 475 U.S. 335 (1986).

The application of qualified immunity involves balancing the need to provide compensation to parties whose rights have been violated with the need to insulate government officials from fear of personal liability for performing their exercise of governmental authority as long as their actions do not violate clearly established federal law.

The defendant has the ultimate burden of establishing the qualified immunity defense. Plaintiff must establish that defendant violated a clearly established federal right. *Bazan v.*

4

*Hidalgo County,* 246 F.3d 481 (5th Cir. 2001).  The initial inquiry is whether the complaint alleges a violation of a federally protected right.  *Seigert v. Gilley,* 500 U.S. 116 (1991). Thereafter, the Court determines as a matter of law whether the right allegedly violated was clearly established at the time.

Qualified immunity provides not merely an immunity from liability, but immunity from the burdens of litigation.  *Mitchell v. Forsyth,* 472 U.S. 511(1985).  Therefore, in determining whether the defense of qualified immunity is applicable in a motion for summary judgment in 1983 cases, the Court must grant the motion unless the detainee demonstrates that the responsible officials had subjective knowledge of a substantial risk of severe harm to the pretrial detainee but responded to that risk with deliberate indifference.

**B.      Plaintiffs' Section 1983 Claims.**

Claims for violations of pretrial detainees' constitutional rights pursuant to 42 U.S.C. § 1983 are classified as either "an attack on a 'condition of confinement' or as an 'episodic act or omission.'"  *Scott v. Moore,* 114 F.3d 51, 53 (5th Cir. 1997) (en banc).  "Condition of confinement" cases include such claims as complaints "of the number of bunks in a cell or his television or mail privileges."  *Id.*  In these cases, a court will find a constitutional violation exists only if the condition of confinement is not reasonably related to a legitimate, non-punitive governmental objective.  *Id.* (citing *Bell v. Wolfish,* 441 U.S. 520, 539 (1979)).   "Episodic act or omission" claims are "where the complained-of-harm is a particular act or omission of one or more officials."  *Id.*  This case involves episodic act or omission claims, not claims concerning conditions of confinement.

5

Episodic acts or omissions of a state jail official do not violate a pretrial detainee's due process right to medical care or protection from suicide unless the official acted or failed to act with subjective deliberate indifference to the detainee's rights.  *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996)(Hare II)(en banc).  Negligent inaction by a jail officer does not violate the due process rights.  *Id*. at  650.

1.      **Whether the Individual Defendants are Entitled to Qualified Immunity.**

To determine whether an official is entitled to qualified immunity, a court must first ascertain whether the plaintiff has alleged a violation of a clearly established constitutional right. *Seigert v. Gilley,* 500 U.S. 226 (1991).  The failure to provide a pretrial detainee with adequate protection from his known suicidal impulses is actionable under 42 U.S.C. § 1983.  *Flores,* 124 F.3d at 738.  The Court must determine whether the official's conduct was objectively unreasonable in light of clearly established law at the time of the incident.  *Hare v. City of Corinth,* 135 F.3d 320, 325 (5th Cir. 1996) (*Hare III*).  The official's conduct is held to be objectively reasonable unless all reasonable officials in the same circumstances would have then known that the conduct in question violated the constitutional right alleged by the plaintiff. *Thompson v. Upshur County, TX,* 245 F.3d 447, 457 (5th Cir. 2001).

In addition, the Fifth Circuit has denied officials qualified immunity from liability for violations of a detainee's clearly established constitutional rights if they 'had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk.'"  *Jacobs v. West Feliciana Sheriff's Dep't,* 228 F.3d 388, 393 (5th Cir. 2000) (quoting *Hare II,* 74 F.3d at 649, n.4.  Therefore, the court "must hold the

6

defendants to the standard of subjective deliberate indifference in determining whether their conduct was objectively reasonable." *Id.* at 394.  The correct standard is not whether the jail officers "knew or should have known" but whether they had actual knowledge of the substantial risk of suicide, and responded with deliberate indifference.[1]  Immunity is available even where the acts of the officials constitute gross negligence.  *Hare II,* 74 F.3d at 645.

The defendants have cleared the first inquiry by alleging a violation of Wajda's substantive due process rights.  In order to determine whether the defendants' conduct was objectively unreasonable in light of clearly established law at the time of Wajda's suicide, each individual defendant's conduct will be examined.

        a.      **Nurse Lashon Johnson**

Nurse Johnson was with Wajda during the admission process.  She administered medication to him for his bi-polar disorder, and arranged for him to receive his evening medication.  During the admission process, she observed from prior records that Wajda had previously attempted to commit suicide while in custody at the Center.  In her deposition, she testified that, even though she had actual knowledge of his prior suicide attempt at the facility, she did not recommend that Wajda be placed on suicide watch because she observed him to be joking and acting as though he were happy, which indicated to her that he was not at risk for suicide.  She further testified that she did not fill out a Health History form required by the policy manual, and she does not remember asking Wajda any of the questions on the form,

---

[1]<u>Hare II</u> defines deliberate indifference as "the subjective intent to cause harm." 74 F.3d at 649.

including whether he had ever been treated for a mental condition or if he had attempted to commit suicide.  Nurse Johnson testified that, if a detainee indicates during the admission process that he previously attempted suicide, she would refer him to the social worker for further evaluation,[2] although she would not automatically place the detainee on suicide watch.[3]  Nurse Johnson did not notify anyone of her actual knowledge of Wajda's previous suicide attempt, knowing there were other individuals, including the Center's doctor and social worker,[4] who would participate in a decision whether Wajda should be placed under suicide watch based on her initial intake report.

Although Nurse Johnson claims to have determined that Wajda did not appear to be at risk for suicide, there were signs which she observed during the admissions process that indicated otherwise.  These signs, coupled with her actual knowledge of his prior suicide attempt at the facility, gave her the information that would have warranted further scrutiny, especially in light of the fact that all actions following the screening process depended upon her fulfilling her job of transmitting to other staff the knowledge she gained through the admission process.  Nurse Johnson knew that Wajda was taking psychotropic medication for bi-polar disorder, and he exhibited signs of self-mutilation.  According to Deputy Cook, Wajda was upset,[5] and Captain

---

[2]*Id.* at 27-29.

[3]Deposition of Nurse Johnson, at 75-76, 107.

[4]*Id.* at 60-61.

[5]Deposition of Deputy Cook, at 8.

Winchester stated that he was fidgety.[6]

This Court concludes that Nurse Johnson's conduct could be found to be objectively unreasonable under the circumstances.  A jury could determine that Nurse Johnson acted with deliberate indifference because she had actual knowledge of a prior suicide attempt at the facility and failed to properly complete the intake form which would have revealed Wajda's suicide risk to other staff members.  Accordingly, Nurse Johnson is not entitled to qualified immunity, and that the motion for summary judgment of Nurse Johnson is denied.

**b.    Sergeant Avery Peter Joseph.**

Sergeant Joseph had been a guard at the Center for less than three months, and was still on probation at the time of Wajda's suicide.[7]  Sergeant Joseph was in charge of the dormitory that Wajda was assigned to that evening.  When he came on duty at 6:00 p.m., he was not told that Wajda was at risk for suicide nor that he had previously attempted suicide.

The written log indicates that Sergeant Joseph made a visual room check shortly after he began his duty.  Sergeant Joseph testified that he also saw Wajda standing in the doorway of his room at 7:00 p.m., when he opened the door for a youth in the room across the hall from Wajda's room.  He also testified that he observed Wajda at other times, but when questioned about those times, he testified he could not specifically remember having done so,[8] and there is no record of Sergeant Joseph's checking on Wajda for at least one and a half hours.

---

[6] Deposition o Captain Winchester, at 66.

[7] Deposition of Sergeant Joseph (Part I), at 57-58.

[8] Deposition of Sergeant Joseph (Part II), at 97-99.

Sergeant Joseph was an inexperienced guard at the Center and did not know that Wajda was at risk for suicide.  He testified that he had read the policy and procedure manual,[9] and that he knew the purpose of checking on a youth who was locked in his room was "to make sure he's not harming himself."[10]  In failing to check on Wajda for at least one and a half hours, Sergeant Joseph ignored the policy manual's directives of frequent checks on a locked-down juvenile, and his own instinct that the purpose for the rule was to be sure the newly admitted juvenile was not harming himself.  However, because of his lack of actual knowledge of the risk for suicide, a jury could not find Sergeant Joseph's actions subjectively indifferent, and that his conduct was not objectively reasonable.  Thus, Sergeant Joseph is entitled to summary judgment on qualified immunity.

> c.      **Captain Keith Coxie.**

Captain Coxie also started his shift at 6:00 p.m., and was in charge of supervising the evening shift of employees.  Captain Coxie had no contact with Wajda prior to the suicide.  Captain Coxie testified that upon arriving at Wajda's room, Sergeant Joseph and Sergeant Steib had already taken Wajda down.  Although Captain Coxie identified a faint pulse and heartbeat, he did not perform CPR even though he was trained to do so.  Captain Coxie testified that "seeing him stretched out like that – I was like in a shock."[11]  He also testified that performing

---

[9]*Id.* at 9-10.

[10]Deposition of Sergeant Joseph (Vol. I), at 22-23.  Sergeant Joseph testified during his deposition that, because it had been such a long time since he quit working at the Center, he could not remember how often he was required to perform visual checks on youths.  Deposition of Sergeant Joseph (Vol. II), at 23.

[11]Deposition of Captain Coxie, at 141.

CPR was something that "just didn't register."[12]  Rather, he called Sergeant Jessie to come to

Wajda's room, and left to call 911 and waited in the front office to open the gates for the

paramedics.[13]  Sergeant Jessie eventually performed CPR on Wajda after he showed signs of

turning blue.

Captain Coxie knew that Wajda had been hanging by his neck and had been deprived of

oxygen.  Although he detected a faint pulse and heartbeat, he failed to perform CPR or to order

another employee to do so.[14] Although these actions may constitute negligence, a jury could not

find that Captain Coxie acted with subjective deliberate indifference, and that his conduct was

not objectively reasonable.  Therefore, Captain Coxie is entitled to summary judgment on

qualified immunity.

>           **d.      Major Leon Walker.**

Major Walker's primary duties in 2004 were to "oversee the overall care of the facility,

the employees, and the kids."[15]  He also was responsible for teaching the orientation program to

employees, which included teaching the information contained in the Center's policy and

procedure manual.[16]

Major Walker was on vacation and not at the Center on December 15, 2004.  "Under

---

[12]*Id.* at 142.

[13]Deposition of Captain Coxie, at 117-23.

[14]*Id.* at 125.

[15]Deposition of Major walker,at 174.

[16]*Id.* at 33.

Section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability." *Thompkins v. Belt,* 828 F.2d 298, 303 (5th Cir. 1987).  When considering the liability of a supervisory official who was not personally involved in the acts or omissions that allegedly deprived an individual of his constitutional rights under section 1983, the court must determine if:  (1) the official failed to train or supervise the officials involved, (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights, and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights.  *Thompson,* 245 F.3d at 459.  "Proof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is normally required" before a supervisor is denied qualified immunity.  *Id.*  In fact, the plaintiff must demonstrate a pattern of similar violations.  *Id.*  "Furthermore, the inadequacy of training must be obvious and obviously likely to result in a constitutional violation."  *Id.*

Defendants contend that, because Major Walker was not present at the Center and had no personal awareness or involvement with Wajda, he cannot be liable for a 1983 violation. Plaintiffs argue that Major Walker failed to establish and enforce adequate intake procedures, and procedures to make certain that Wajda was kept under appropriate supervision and observation.

Plaintiffs do not allege that Major Walker was responsible for conducting any of the procedures to which they refer.  Therefore, the court concludes that under the facts alleged, no jury could find Walker's actions subjectively indifferent or that his conduct was objectively unreasonable.  Major Walker is entitled to summary judgment on qualified immunity

12

2.        **Liability of the Parish and Center.**

The Center's written policies and procedures are contained in the "Policy and Procedure Manual." The preface to the manual states that "[a]ll exceptions and modifications of this manual must be requested by the Center Director in writing and approved by the Parish Governing Authority prior to using any modification of the manual."[17]

The manual requires that newly admitted juveniles are to be evaluated during the admission process, and an official is required to complete a "Receiving Screening Form" and "Initial Medical Screening Checklist." The "Initial Medical Screening Checklist" asks whether the juvenile has ever tried to commit suicide.[18] A "Health History" form also is required to be filled out, which contains questions concerning a juvenile's mental health status, including whether the youth has ever been treated for a mental condition or nervous problem, and whether the youth has ever tried to injure himself or commit suicide.

In addition, the manual requires a suicide risk assessment to screen "for those youth who are at the greatest risk of suicide and to refer those youth for a professional assessment and recommendations for follow-up intervention."[19] As part of the assessment, the "Suicide Risk Screening Instrument" asks whether the juvenile has ever tried to commit suicide. The manual notes that youths "in detention normally experience anxiety and emotional distress," which is why the Center's policy is to "provide constant supervision during awake shifts, room checks at

---

[17]*Id.*, preface to manual.

[18]St. James Parish Youth Center's Policy and Procedure Manual, ch. 2-5.

[19]*Id.*, ch. 2-6.

13

least every ten minutes whenever youth are in a sleeping or isolation room and constant sight and sound supervision of youth who have been assessed as suicidal."[20]  A "youth who is depressed and possibly suicidal should not be placed in a room by himself/herself.  Isolation only enhances suicidal thoughts."[21]  The manual mandates that "[t]he suicide risk assessment shall be reviewed by the Director or designee within one hour of the youth's admission."[22]

> Chapter 9 of the manual specifically concerns "confinement," and provides in part that:

> [i]t is the intent of the Center that the use of confinement, either room confinement or disciplinary confinement, be used only as a last resort and only after all reasonable efforts to work with the juveniles, through the interactive model, have failed to bring the youth's behavior within the control of detention staff.[23]

The manual also provides that whenever a youth is confined to his room, "the Director shall ensure that [the youth's] designated representative will visually observe the youth every ten minutes."[24]  In addition, the manual states that "[w]henever a youth has been screened as potentially suicidal, <u>constant visual</u> observation shall be maintained."[25]

In addition to these edicts, the Center, as a matter of custom, places all newly admitted juveniles under a "72-hour rule."  This unwritten rule has been in use since the Center was

---

[20]*Id.,* ch. 3-5(A); ch.3-6(G)(5).

[21]*Id.*, ch. 3-5(E)(6); ch. 3-6(G)(2).

[22]*Id.*

[23]*Id.*, ch. 9-1(A).

[24]*Id.*, ch. 9-9.

[25]*Id.*, ch. 3-5(G) (emphasis in original).

opened, and requires newly admitted juveniles to be in their rooms an additional two hours, from 7:00 p.m. to 9:00 p.m. each evening, during their first 72 hours in the Center.  Wajda was being held in his room under the "72-hour rule" when he committed suicide between 7:00 p.m. when he was last observed, and 8:30 p.m. when he was found hanging in his cell.

To hold the Parish and Center liable "the detainee must show that the municipal employee's act [or omission] resulted from a municipal policy or custom adopted or maintained with *objective* deliberate indifference to the detainee's constitutional rights."  *Hare II,* 74 F.3d at 649, n.4.  In other words, plaintiffs may recover only if they can show that some policy or custom caused the Center's employees to deprive Wajda of proper protection from his suicidal tendencies.  *Burns,* 905 F.2d at 102.

Plaintiffs allege deliberate indifference towards Wajda's right to protection from his own suicidal impulses as a result of the Parish and/or Center's failure to adopt and enforce policies to prevent detainees from taking their own lives, and to provide adequate training to its personnel in dealing with suicidal youths.  The Parish and Center contend summary judgment is proper because no policy or custom was adopted or maintained with objective deliberate indifference to Wajda's constitutional rights.

The Center's policy and procedure manual states:

This is the official policy and procedural manual for the St. James Youth Center Detention Program. . . .  All exceptions and modifications of this manual must be requested by the Center Director in writing and approved by the Parish Governing Authority prior to using any modification of manual policy.[26]

---

[26]*Id.,* preface to manual.

15

The manual also states:

> This facility is operated by the St. James Parish, Convent, Louisiana. Operational authority is delegated by the St. James Parish Council to the Center Director who is employed by the St. James Parish Council. The Director, therefore, is responsible to the St. James Parish Council for the proper administration and operation of this facility.[27]

The St. James Parish Council is responsible for establishing final government policy on behalf of the Center.

> The Fifth Circuit has held that:

> A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body or the municipality or to an official to whom the body had delegated policy-making authority.

Additionally, the Center has utilized the "72-hour rule" for a number of years and its Director, Mr. Lubrano, testified that he was aware that the rule had been in use.[28]   Although the rule has not been authorized officially by the St. James Parish Council, it has become a "custom or usage" that represents municipal policy.

### a.      Supervision of Wajda While He was in Confinement.

Plaintiffs contend that the Center and Parish failed to adequately adopt and enforce policies that would have prevented Wajda from taking his own life. Specifically, plaintiffs contend that the Center's employees' acts resulted from the Center's failure to follow its policy

---

[27]St. James Parish Youth Center, Policy and Procedure Manual, ch. 1-1.

[28]Deposition of John Lubrano, at 119-20.

of properly observing youth's who are potentially suicidal.

    **i.**    **Failure to Properly Observe Wajda Pursuant to Written Policy.**

       The Center's policy mandates that youths not be confined to their rooms unless doing so is a last resort.[29]  Further, if youths are confined to their room for any reason, they are to be observed at least every ten minutes.[30]  Youths who are considered potentially suicidal are never to be placed in a room by themselves, and are to be visually observed at all times.[31]

       In *Rhyne v. Henderson County,* 973 F.2d 386 (5th Cir. 1992), a mother of a pretrial detainee who committed suicide while in custody sued the municipality for, *inter alia,* failing to adopt a policy of continuously observing suicidal inmates, making their suicide more likely.  The existing policy was to check on suicidal inmates every ten minutes.  *Id.* at 393.  The Fifth Circuit concluded that even if a jury could find that the municipality's policy did not involve continuous observation of suicidal inmates, there was no evidence that such a policy was deliberately indifferent.  According to the court, the municipality "was not indifferent in the literal sense of the word to the known risk of suicide:  its policy, according to testimony on which Rhyne relies, was to check on suicidal inmates every ten minutes–about six times as often as non-suicidal inmates were checked.  This effort indicates not apathy, but concern."  *Id.*

       Here, the policies were adopted with the purpose of preventing youths from harming

---

[29]*Id.*, ch. 9-1.

[30]*Id.*, ch. 9-9.

[31]*Id.*

themselves.  There are no facts indicating that the written policies concerning room confinement and observation of youths were adopted or enforced with objective deliberate indifference. Rather, as in *Rhyne,* the policies concerning room confinement and observation were adopted with concern, and not apathy.  Therefore, the court concludes that the Parish and Center cannot be held liable for subjective deliberate indifference in adopting or enforcing policies.  Thus, the defendants' motion for summary judgment is granted as it relates to the Parish and Center's written policies of observation and confinement of youths.

### ii.     Failure to Properly Observe Wajda Pursuant to the "72-Hour Rule."

Under the "72-hour rule," which is a custom at the Center, a newly admitted juvenile is kept locked in his room for at least an additional two hours each night for his first 72-hours. Wajda committed suicide while he was confined to his room under the "72-hour rule."  Plaintiffs argue that placing Wajda under this rule without proper supervision allowed him to be alone long enough to develop the plan to commit suicide, and to carry out the act.  Dr. Richards, one of Wajda's treating psychiatrists, noted that being left in a room leaves persons at risk for suicide "to their own thoughts," which is enough to cause them to become afraid, allow their thoughts to race, and then to become more disturbed and commit impulsive acts such as suicide.

The Center adopted the "72-hour rule" for the purpose of allowing newly admitted juveniles to adjust to the facility.  The reason the rule was adopted, like that of the Center's written policies, was out of concern for the well being of the juveniles, not from apathy.  The rule required monitoring the confined youth at least every ten minutes.  Therefore, the court

18

concludes that the "72-hour rule" was not adopted by the Parish and Center with objective deliberate indifference.

### b.    Inadequate Training.

In *Evans v. City of Marlin Texas,* 986 F.2d 104 (5th Cir. 1993), the Fifth Circuit summarized the basis of municipal liability for failure to train in detainee suicide cases:

> A municipality should be required to provide its police officers with the minimal training to detect obvious medical needs of detainees with known, demonstrable, and serious mental disorders.  Police personnel are not required to unerringly detect suicidal tendencies; such an exacting standard requires the skills of an experienced medical professional with psychiatric training. . .  Recognizing these practical realities, the [court] held that detainees have no absolute right to a complete psychological examination.  Absent such a right, the failure to train custodial officials in screening procedures to detect latent suicidal tendencies does not rise to the level of a constitutional violation.

*Evans,* 986 F.2d at 108 (internal citations omitted).

Plaintiffs allege that the Center failed to adequately train its employees in suicide monitoring and prevention. The Parish and Center contend that employees were trained to assess and recognize signs that a youth may be at risk for suicide.  According to defendants, the Center had a suicide prevention training video and provided in-service training to its employees.

Nurse Johnson testified that she attended a class for approximately two weeks while in nursing school during which she was instructed on working with "mental people and people that was in the facility for their conditions."[32]  Beyond that, Nurse Johnson was provided a manual entitled "Suicidal Youth" by the Center upon being hired, but she could not remember whether

---

[32]*Id.* at 77-78.

19

the manual contained a section of how to recognize behavior in persons that are at risk for suicide.[33]

Sergeant Joseph testified that he attended an "orientation, a walk-through, and watched a tape," and that he also was provided with a copy of the Center's policy and procedure manual.[34] Sergeant Joseph, was not shown a CD that the Center has providing training on how to observe persons to determine whether they exhibit signs of being at risk for suicide.[35]  Sergeant Joseph had no experience working with juveniles with mental health problems,[36] and no training on how to handle medical emergencies.[37]

Captain Winchester had been employed by the Center for fourteen years and was in charge of Wajda's admission to the Center.  Captain Winchester testified that during her tenure at the Center, she had attended two or three workshops, each lasting a couple of days.  She believes that she has been shown a video about how to detect whether a detainee is at risk for suicide.[38]

Captain Winchester further testified that in addition to the forms Nurse Johnson was responsible for completing, she was responsible for filling out three forms upon Wajda's

---

[33]*Id.* at 101.

[34]Deposition of Sergeant Joseph (Vol. I), at 18.

[35]*Id.* at 24.

[36]Deposition of Sergeant Joseph (Vol. II), at 44.

[37]*Id.* at 30.

[38]Deposition of Captain Winchester, at 9.

admission, which were the "Suicide Risk Screening Instrument, Initial Medical Screening Checklist, and the Receiving Screening" form.[39]  However, she testified that she did not fill these forms out as required.[40]  The Suicide Risk Screening Instrument asks whether the juvenile has ever tried to kill himself.  Wichester testified that if the juvenile answered "yes" or "maybe" to that question, he would be placed on suicide watch.[41]  The Initial Medical Screening Checklist also asks whether the juvenile has ever tried to kill himself.  Captain Winchester testified that if the juvenile answered yes, he would be placed on suicide watch.[42]

The court finds the Parish and Center did not fail to provide adequate suicide recognition and prevention training to the employees.  Therefore, the motion for summary judgment of the Parish and Center's liability concerning inadequate training of employees is granted.

---

[39]*Id.* at 47.

[40]*Id.* at 56.

[41]*Id.* at 49.

[42]*Id.*

**CONCLUSION**

Nurse Johnson is not entitled to summary judgment on qualified immunity because  a jury could determine that she acted with subjective deliberate indifference, and that her actions were objectively unreasonable in light of the clearly established law at the time of the incident.

Sergeant Avery Peter Joseph, Captain Keith Coxie, and Major Leon Walker because they are entitled to qualified immunity because no jury could find that they had actual knowledge of the substantial risk of suicide, but acted with deliberate indifference.  Summary Judgment as to these individuals is **GRANTED.**

The Parish and Center's motions for summary judgment are granted with regard to liability for failing to properly adopt or maintain policies concerning confinement and observation, and failure to train their employees.  The Parish and Center adopted and maintained written policies concerning observation and confinement, which addressed Wajda's constitutional rights to be protected from his suicidal tendencies.

New Orleans, Louisiana, this   17th  day of January, 2007.


MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE